NOTICE
Decision filed 09/24/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230331-U

NO. 5-23-0331

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| ERIN L. HUDSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 21-L-73 |
| | ) | |
| GERRY A. BASLER, | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in granting the plaintiff's motion for a new trial on damages where the jury's verdict as to damages was internally inconsistent.

¶ 2    The plaintiff, Erin L. Hudson, brought an action against the defendant, Gerry A. Basler, and alleged that she suffered personal injuries because of the defendant's negligence in operating his motor vehicle. Following a trial, the jury found in favor of the plaintiff and awarded $72,000 for past and future medical expenses, but nothing for past and future pain and suffering, loss of a normal life, and lost wages. The jury also found that the plaintiff was 35% contributorily negligent and reduced the award to $46,800. The plaintiff filed a motion for new trial, arguing that the jury's verdict was internally inconsistent as to the damages awarded. The trial court granted the plaintiff's motion and ordered a new trial on the issues of past and future medical expenses, past and future pain and suffering, and past and future loss of a normal life. We granted the defendant's petition

1

for leave to appeal under Illinois Supreme Court Rule 306(a)(1) (eff. Nov. 1, 2017) and now affirm the trial court's order.

¶ 3                                    I. BACKGROUND

¶ 4     On July 20, 2019, at approximately 8:30 p.m., the plaintiff was driving her 2014 Kia Soul westbound on Illinois Route 13 (Route 13), preparing to merge onto southbound Interstate 57 (I-57). At the same time, the defendant was driving his 2011 Cadillac Deville eastbound on Route 13, preparing to merge onto southbound I-57. The westbound and eastbound merge lanes converged into a single lane entering I-57. A posted traffic sign directed drivers merging from eastbound Route 13 to yield to vehicles merging from westbound Route 13. The defendant did not yield and the front fender on the driver's side of his vehicle struck the rear-quarter panel on the passenger side of the plaintiff's vehicle. The defendant and his wife, Rosa Basler, were not injured in the accident. While at the accident scene, the plaintiff did not believe she was injured. The following morning, the plaintiff awoke with pain in her neck and right extremity. She sought medical treatment for her injuries.

¶ 5     On June 10, 2021, the plaintiff filed a negligence complaint against the defendant. In the complaint, the plaintiff claimed that the defendant negligently operated his vehicle in violation of several provisions of the Illinois Vehicle Code (625 ILCS 5/11-100 *et seq.* (West 2018)). The plaintiff alleged, among other things, that the defendant failed to yield the right of way to the plaintiff's vehicle and that the defendant failed to safely and properly merge to avoid a collision. The plaintiff further alleged that as a proximate cause of the defendant's negligence, she suffered personal injuries. She sought damages for past and future medical expenses, past and future pain and suffering, past and future loss of a normal life, and past and future lost wages.

2

¶ 6     The defendant filed an answer to the complaint. Therein, the defendant denied that he was negligent, that his negligence was a proximate cause of the injuries alleged by the plaintiff, and that the plaintiff was injured to the extent claimed. The defendant also filed affirmative defenses. The defendant alleged that the plaintiff was contributorily negligent in whole or in part in that she failed to keep her vehicle under proper control, failed to keep a proper lookout, failed to exercise reasonable care to avoid injury, and drove at an excessive rate of speed. The plaintiff denied that she was contributorily negligent and that her negligence caused or contributed to her injuries.

¶ 7     The jury trial began on February 21, 2023. At trial, the parties' accounts of the basic facts of collision were similar, but they disagreed about who was "at fault." They also disagreed about the nature and the extent of the plaintiff's injuries and damages.

¶ 8     The plaintiff called the defendant as an adverse witness. The defendant testified that the plaintiff was "entirely at fault" for the accident. He denied any fault on his part. He also denied that the plaintiff was injured in the accident. The defendant testified that he was familiar with the roadway and intersection of Illinois Route 13 and Interstate 57, and he described the layout for the jury. He noted that there were two lanes of travel from westbound Illinois Route 13 onto southbound I-57, and one lane of travel from eastbound Illinois Route 13 to southbound I-57. Those lanes eventually converged into a single lane to enter I-57. The defendant recalled that he was driving in the eastbound lane and that his lane was controlled by a yield sign. The defendant acknowledged that drivers in the westbound lanes had the right of way and that he had a duty to yield to them. He also acknowledged that this section of roadway was "well lit," and that he had an unobstructed view of it. The impact occurred after he drove past the yield sign. The left front quarter panel of his vehicle impacted the right rear quarter panel of the plaintiff's vehicle. At the point of impact, the defendant's vehicle was moving at about 30 miles per hour. The plaintiff's

vehicle bumped his vehicle and then moved past it going "a whole lot faster." The defendant did not see the plaintiff's vehicle until the impact. He suggested that he did not see the plaintiff's vehicle because she accelerated to pass him and did not have her lights on. He acknowledged, however, that he did not know the speed of the plaintiff's vehicle and he did not know if her headlights were on. The defendant described the impact as "minor."

¶ 9 When questioned by his attorney, the defendant noted that he had checked his mirrors and the blind spot over his left shoulder prior to the impact. He estimated that his speed was no more than 30 or 35 miles per hour, and that the plaintiff's speed was 60 miles per hour when she passed him. The defendant did not notice any other vehicles driving in the merge lanes. He thought the plaintiff could have moved over to the westbound passing lane to avoid the impact. He admitted that there would have been no impact if he had yielded.

¶ 10 Ethan Peebles, an Illinois State Police officer, was dispatched to the scene of the accident on July 20, 2019. Trooper Peebles talked with the drivers, surveyed the roadway, took photographs, and prepared a report, including a diagram of the accident scene. Trooper Peebles noted that there were two lanes of travel from westbound Route 13 to southbound I-57, while eastbound drivers had one lane. Based upon his view of the scene, each driver would have had an unobstructed view of the other prior to the impact. Trooper Peebles also noted that the defendant had a yield sign, and that the front corner on the driver's side of the defendant's vehicle impacted the rear passenger side of the plaintiff's vehicle. He concluded that the defendant's vehicle was the "at-fault" vehicle. When Trooper Peebles talked with the defendant, the defendant did not indicate that he had not seen the plaintiff's vehicle because it was moving at 60 or 90 miles per hour or because the plaintiff's headlights were not on. Had the defendant mentioned this, Trooper Peebles would have quoted it in his report. Trooper Peebles did not calculate the speed of the

4

vehicles on impact, but he did not think it was "a crazy speed or there would have been a lot of damage." He estimated that the damage to the plaintiff's vehicle was over $1500. Trooper Peebles also inquired about injuries as part of his investigation. The defendant and his wife did not claim to be injured. Neither did the plaintiff. Trooper Peebles was not required to follow up with persons involved in accidents to determine if they sought medical treatment later. During cross-examination, Trooper Peebles was asked whether he found any evidence that the plaintiff "was unable or prevented from moving laterally into the free lane to avoid the collision." He replied, "No."

¶ 11    The plaintiff testified that she was a single mother, raising five children at the time of the accident. She was employed by Help at Home as an in-home caregiver for elderly persons during the week. Her duties included light house-cleaning, cooking, and transporting clients to medical appointments. She worked at Aldi's grocery store as a cashier and stocker on weekends. She earned $12 per hour at Aldi's.

¶ 12    On the day of the accident, July 20, 2019, the plaintiff worked her regular shift at Aldi's. She left Aldi's sometime between 8 p.m. and 8:30 p.m. She intended to drive to her boyfriend's home that evening. The plaintiff recalled that she turned her headlights on manually when she got into her vehicle. She noted that this was one of her habits. Just before reaching the merge lane to I-57, she stopped for a red light. When the light turned green, she proceeded onto the entrance ramp to I-57. She estimated that her speed was 30 to 40 miles per hour. As she drove along, she noticed another vehicle approaching from westbound Route 13. She knew that vehicle had a yield sign. The plaintiff testified that she was not sure whether that car was going to yield, so she gripped the steering and accelerated a little bit. She did not have time to check the passing lane on her left to see if she could move into it. The defendant's vehicle went through the yield sign and struck her

5

vehicle. Upon impact, her car "wiggled," knocking her purse off the passenger seat. Her seat belt caught, and her head went back and forth against the head rest. The plaintiff pulled over and parked her vehicle on the shoulder. She walked up to the defendant's vehicle and asked the defendant and his passenger if they were okay. The defendant replied, "Why did you hit me? What are you doing?" The defendant did not mention her headlights or accuse her of speeding. The plaintiff told the defendant that she would call the police. The plaintiff testified that she did her best to avoid the accident by accelerating, and she did not think she was at fault. The estimated damage to her vehicle was $1530. The plaintiff admitted she was shaken up at the accident scene and did not think she was injured.

¶ 13     When the plaintiff awoke the next morning, she felt pain in her neck and shoulders. She worked her regular shift at Aldi's that day because she did not want to lose her job. She used over-the-counter pain relievers and a heating pad to try to relieve the pain. The next morning, July 22, 2019, the plaintiff was still having neck pain. She worked her shift at Help at Home, and then went to the emergency department at Memorial Hospital. She reported severe neck pain, shoulder pain, lower back pain, and a headache, and she was given an injection for the pain and an off-work slip. The plaintiff called her primary care physician, Dr. Jodi Bryant, but she could not get an appointment until July 29, 2019. The plaintiff continued to have severe neck pain. On July 26, 2019, she went to the emergency department at Heartland Regional Medical Center for further evaluation. The plaintiff saw Dr. Bryant on July 29, 2019. The plaintiff gave a history of neck and shoulder pain following a motor vehicle accident. She also reported some numbness and tingling in her right hand. Following a physical examination, Dr. Bryant prescribed medication and physical therapy, and she instructed the plaintiff not to work for two weeks. The plaintiff continued to follow up with Dr. Bryant. In October 2019, Dr. Bryant ordered magnetic resonance imaging

(MRI) and subsequently referred the plaintiff to Dr. Amit Bhandarkar, an orthopedic surgeon and pain management physician, for a consultation.

¶ 14    The plaintiff's first appointment with Dr. Bhandarkar was on October 30, 2019. Dr. Bhandarkar evaluated the plaintiff and prescribed an anti-inflammatory and pain medications, along with physical therapy. While under Dr. Bhandarkar's care, the plaintiff had an electromyography (EMG) procedure and other diagnostic tests. The plaintiff recalled that the EMG involved needles and sending electrical shocks through her and was "not pleasant." In 2020, Dr. Bhandarkar moved to a new office in Centralia. Between January 2021 and June 2022, the plaintiff did not see Dr. Bhandarkar. She explained that his new office was an hour's drive from her residence, and she knew her only treatment option was surgery. On June 24, 2022, the plaintiff returned to see Dr. Bhandarkar. At that time, she reported that her pain level was 10 out of 10, that lifting and other physical activities aggravated the pain, and that she was considering surgery as nothing seemed to relieve her pain. After that visit, she underwent a follow-up MRI and an EMG. The plaintiff saw Dr. Bhandarkar again in November 2022 and January 2023. During those visits, Dr. Bhandarkar noted that some of the plaintiff's symptoms lined up with rheumatoid arthritis, and he prescribed Naproxen and Aleve to determine whether those medications might alleviate some of her symptoms. He also discussed a neck fusion as a surgical option.

¶ 15    At trial, the plaintiff testified that she had a follow-up visit scheduled with Dr. Bhandarkar on March 7, 2023, and an appointment with a rheumatologist on March 23, 2023. The plaintiff admitted that she had good days and bad days. She continued to experience pain in her neck, making it difficult to turn her head. She required assistance with activities such as carrying laundry baskets and mowing the yard. She was able to walk her dog using a modified leash and she did limited gardening. The plaintiff testified that the physical therapy and the medication provided

7

temporary relief, but the pain eventually returned. The plaintiff planned to schedule surgery during her upcoming appointment with Dr. Bhandarkar. She described the prospect of surgery as "scary," but noted that if it would help, she would do it. The plaintiff identified an itemized list of medical bills, physical therapy bills, and medication charges as exhibit C. She testified that she had incurred those bills because of the accident.

¶ 16    During direct examination, and again on cross-examination, the plaintiff testified that she had never been evaluated, diagnosed, or treated for a neck injury before the accident. She was asked about a visit to her doctor in December 2018. There was a note in the "review of systems" that the patient had heavy menstrual bleeding, low back pain, and some aches in the neck and shoulder muscles. The plaintiff stated that she did not recall complaining about neck and shoulder aches at that time. The plaintiff testified that she had fallen one time after the accident. She had moved to a house in Carbondale, and the laundry room was in the basement. As she descended the basement stairs, one of her slippers fell off and she tripped. She grabbed the railing and hit her thigh on a step. She did not fall to the bottom of the stairway. She was not injured and went to work that day. The plaintiff also testified that she stopped working at Aldi's because she was unable to do the work. Her last day was July 21, 2019. She was able to pick up more hours at Help at Home, and she was making more per hour at that job.

¶ 17    The plaintiff's 19-year-old daughter, Keighlyn Hudson, corroborated much of the plaintiff's testimony as to damages. Keighlyn testified that the plaintiff did not have any physical limitations or complaints of pain prior to the accident on July 20, 2019. The plaintiff was able to do housework and yardwork, and she enjoyed gardening, swimming, workouts, and walking the dog. After the accident and into 2020, the plaintiff took medication, received injections, and went to a lot of physical therapy sessions. The treatment did not seem to resolve the plaintiff's neck

pain. Keighlyn recalled that the plaintiff was more sedentary. She no longer worked out and limited her gardening. She hired someone to mow the yard. Keighlyn also recalled that sometime after the motor vehicle accident, the plaintiff tripped and fell onto a basement step, and that she had some pain immediately after the fall.

¶ 18    The plaintiff's treating physicians, Dr. Jodi Bryant and Dr. Amit Bhandarkar, testified via videotaped depositions. Dr. Bryant, a board-certified family medicine specialist, had provided patient care for the plaintiff since 2011. Dr. Bryant testified that she did not treat the plaintiff for any cervical spine problems prior to July 20, 2019. Dr. Bryant reviewed the plaintiff's clinic record and noted that a physician's assistant, Sherri Barr, saw the plaintiff for complaints of abnormal vaginal bleeding and low back pain in November 2018. Barr prescribed ibuprofen and Flexeril for the low back pain. The plaintiff had a follow-up appointment with Barr on December 4, 2018. Dr. Bryant testified that there was a reference to muscle aches in the plaintiff's right shoulder and neck in the "review of systems" section from that visit. Dr. Bryant noted that this was not the patient's chief complaint that day. Dr. Bryant further noted that there was no reference to neck or shoulder pain in the "history of present illness" or "diagnosis" from that follow-up visit. The record also indicated that the physical examination of the plaintiff's neck was normal. PA Barr suggested chiropractic therapy and prescribed ibuprofen and Flexeril as needed for the low back pain.

¶ 19    Dr. Bryant saw the plaintiff in the office on July 29, 2019. During that visit, the plaintiff gave a history of a motor vehicle accident on July 20, 2019. She complained of pain in her neck moving into her right shoulder. The plaintiff reported that she went to the emergency department with neck complaints. She returned to the emergency department a few days later due to difficulty turning her head. A CT scan of her neck was negative. Dr. Bryant performed a physical examination and noted tenderness of the neck muscles and limited range of motion. Dr. Bryant

9

diagnosed cervicalgia, or neck pain, which was related to the motor vehicle accident. She prescribed anti-inflammatory medication and physical therapy. She also directed the plaintiff to remain off work for two weeks. In a follow-up visit on August 12, 2019, Dr. Bryant noted that the plaintiff had complaints of neck pain and daily headaches due to the muscle tightness and spasm in the neck. The plaintiff also reported that physical therapy was helping. The physical examination of the plaintiff's neck revealed that the range of motion had improved and that her motor strength and reflexes were within normal limits. Dr. Bryant continued the physical therapy and the anti-inflammatory medication. She imposed 10-pound weight-lifting restriction, with no overhead lifting. Over the next two months, the plaintiff's condition remained basically the same. Dr. Bryant ordered an MRI of the internal structures in the neck. The MRI was performed on October 3, 2019, and revealed degenerative changes at C5-6 and C6-7. Dr. Bryant opined that it was more likely than not that the findings noted on the MRI predated the accident, and that the motor vehicle accident aggravated the condition. She referred the plaintiff to Dr. Amit Bhandarkar, an orthopedic surgeon and pain management physician. Dr. Bryant testified that the plaintiff had an EMG on December 12, 2022, and that the EMG results provided objective confirmation of cervical radiculopathy. She noted that a patient cannot manipulate the findings on an EMG. Dr. Bryant opined that the plaintiff had a chronic neck injury as a result of the accident in July 2019. Dr. Bryant's primary diagnosis was neck pain, and her secondary diagnosis was cervical radiculopathy. Both conditions were related to the crash. Dr. Bryant noted that she prescribed Flexeril was prescribed as a muscle relaxer and a pain medication. The plaintiff's prescription for Flexeril was refilled on August 31, 2020, November 3, 2020, and July 14, 2021. Dr. Bryant testified that the medical expenses arising from her treatment and the prescribed physical therapy were related to the motor vehicle accident on July 20, 2019. Dr. Bryant acknowledged that she had

not seen the plaintiff since January 7, 2021, and she could not offer any opinions about the plaintiff's current medical condition, limitations, and work restrictions.

¶ 20    Dr. Amit Bhandarkar, an orthopedic surgeon and pain management specialist, practiced at the Heartland Health Center in Marion, Illinois. Dr. Bhandarkar first evaluated the plaintiff on October 30, 2019. The plaintiff gave a history of pain in her neck, going into the right arm, hand, and fingers, after an auto accident. The plaintiff reported that her pain level was 8 out of 10, and that the pain increased with forward bending, coughing, sneezing, and weather changes. Conservative management failed to relieve the pain. According to the patient's history, the plaintiff did not require pain treatment prior to the crash. Dr. Bhandarkar conducted a physical examination on the plaintiff. He also reviewed the MRI scan. He noted evidence of disc degeneration at the C5-6 and C6-7 level of the cervical spine. He opined that the degenerative changes likely preexisted the accident. Dr. Bhandarkar ordered an EMG study. The EMG was performed on January 10, 2020, and revealed right mid to lower cervical root radiculopathy. This finding correlated with the plaintiff's physical symptoms and offered some objective evidence of the right-sided radicular pain. The plaintiff also had evidence of moderately severe, bilateral carpal tunnel syndrome. Dr. Bhandarkar testified that the carpal tunnel syndrome was present and asymptomatic prior to the crash. He testified to a reasonable degree of medical certainty that the crash aggravated the carpal tunnel condition. Dr. Bhandarkar diagnosed a whiplash-related injury, neck sprain, and cervical radiculopathy with disc degeneration. He explained that whiplash is a sudden acceleration and deceleration of the neck that causes strains and sprains of the soft tissues in the neck. The plaintiff's neck pain resulted from an aggravation of the preexisting, asymptomatic arthritis. The plaintiff also had an irritated C6 nerve root on the right side of the neck. Dr. Bhandarkar testified to a

11

reasonable degree of medical certainty that there was more likely than not a cause-and-effect relationship between the accident and the patient's diagnoses.

¶ 21    On February 3, 2020, Dr. Bhandarkar provided trigger point injections and cervical epidural injections to treat the plaintiff's conditions. He explained that a trigger point is a knot in the muscle that is extremely tender to the touch. When Dr. Bhandarkar next saw the plaintiff on February 12, 2020, she reported some relief with the injections. During this visit, Dr. Bhandarkar prescribed medication for the pain, inflammation, and nerve pain. In January 2021, Dr. Bhandarkar provided additional injections to treat the plaintiff's symptoms. During the next visit on June 24, 2022, the plaintiff was evaluated by the nurse practitioner in Dr. Bhandarkar's office. The physical exam revealed positive cervical compression and Spurling's sign. The nurse practitioner ordered medication, physical therapy, and a repeat MRI. Dr. Bhandarkar testified that the plaintiff did not have positive signs for psychosocial overlay or psychosomatic issues related to her pain. A second MRI was obtained on October 7, 2022. The results revealed some changes at C4-5 and C5-6 levels of the cervical spine. A second EMG, performed December 12, 2022, provided electrodiagnostic support for the diagnosis of cervical radiculopathy. Dr. Bhandarkar testified that the plaintiff had a "double crush syndrome," meaning two areas where a nerve was pinched, and that this condition occurred resulted from the crash. During the next visit on January 10, 2023, Dr. Bhandarkar noted the physical therapy and medication had not resolved the plaintiff's symptoms, and that the cervical radiculopathy had reached a permanent, chronic stage. At that point, a fusion procedure was the next option. Dr. Bhandarkar explained that a fusion was an elective procedure. The fusion would likely offer some resolution to the plaintiff's neck pain and associated symptoms, but it could also result in decreased range of motion in the neck. Dr. Bhandarkar opined that if the patient elected not to have a surgery, she had a "pretty high" likelihood of needing additional physical

12

therapy and pain injections. Dr. Bhandarkar reviewed the medical expenses listed in exhibit C, and opined to a reasonable degree of medical certainty that those expenses were related to the accident on July 20, 2019.

¶ 22    On cross-examination, Dr. Bhandarkar acknowledged that one hundred percent of what he knew about the patient's neck symptoms and their onset was provided by the plaintiff. Based upon a review of medical records, he agreed that the plaintiff had mild arthritis in her neck, that the MRI revealed a low-grade disc herniation, primarily at C5 and C6, and that the discs were not ruptured. Dr. Bhandarkar testified that the plaintiff's cervical disc disease and degeneration and her carpal tunnel syndrome preexisted the accident. He opined that the accident aggravated those conditions.

¶ 23    The defendant's wife, Rosa Basler, appeared as a witness in defendant's case. Rosa was a retired schoolteacher. She and the defendant had been married for 62 years. Rosa recalled that she and her husband were on their way home from supper when the accident occurred. Her husband was driving. Rosa acknowledged that her husband had a yield sign and that he did not yield to the plaintiff's vehicle. Rosa characterized the impact between their vehicle and the plaintiff's vehicle as a "very minor bump." She did not see the plaintiff's vehicle prior to the impact. She had no knowledge, nor any estimate as to its speed prior to the impact. Likewise, she had no estimate of the speed of their vehicle. After the accident, Rosa took photographs of the plaintiff's vehicle to document the damage. Rosa stated that she observed the plaintiff after the accident, and the plaintiff did not appear to be injured at that time.

¶ 24    The defendant's retained expert witness, Dr. Brett Taylor, testified via videotaped deposition. Dr. Taylor, a board-certified orthopedic surgeon, reviewed the plaintiff's medical records and diagnostic studies and the medical depositions in the case. He did not personally examine the plaintiff. Dr. Taylor testified that the plaintiff had preexisting neck arthritis. He opined

13

that the auto accident exacerbated her preexisting condition and caused a muscular and ligamentous sprain/strain. It did not permanently damage the structures in the neck. Dr. Taylor opined that a period of nonsurgical treatment, including anti-inflammatory medications, topical medications, and physical therapy, was appropriate treatment for the plaintiff's condition. He stated that in most circumstances, those types of symptoms resolve with six to eight weeks, without any permanent damage. Dr. Taylor opined that that the plaintiff's cervical strain/sprain and the exacerbation of the arthritis would have resolved within that time frame with physical therapy and medication. He suggested that any of the plaintiff's subjective complaints beyond that time frame may be due to other factors. He did not think that the plaintiff required any ongoing physical therapy or injections. Dr. Taylor also opined that the auto accident did not cause or exacerbate her bilateral carpal tunnel syndrome. Dr. Taylor was unaware of any evidence-based science that causally connected a motor vehicle accident to carpal tunnel syndrome.

¶ 25 During cross-examination, Dr. Taylor testified that he reviewed the plaintiff's records from 2014 to the present. Based upon the records he reviewed, he agreed that the plaintiff had no diagnostic studies and treatment for her neck prior to the accident. He agreed that the reference to neck and shoulder aches in the "review of systems" during a follow-up visit for gynecological issues in December 2018 was the only reference to a prior neck injury in the plaintiff's medical records. Dr. Taylor agreed that the neck and shoulder aches were neither the primary nor chief complaints on that visit. Dr. Taylor noted that the diagnoses on that visit were pelvic pain, fatigue, and lower back spasms, and that the physician's assistant's recommendation for chiropractic evaluation, physical therapy, and core exercises was under the diagnosis for the lower back spasms. Dr. Taylor reviewed photos of the damage to the vehicles involved in the accident. Dr. Taylor testified that the vehicle damage was not a major factor that influenced his opinions on the

14

plaintiff's diagnoses, treatment, or prognosis. Dr. Taylor testified that the plaintiff suffered an acute cervical sprain/strain and a temporary exacerbation of her preexisting asymptomatic neck arthritis as a result of the accident. Dr. Taylor did not believe that the radiculopathy was caused by the accident.

¶ 26 At the close of the evidence, the plaintiff moved for a directed finding that the plaintiff suffered some injury from the accident. The trial court granted the plaintiff's motion. Subsequently, the trial court instructed the jury that the court had directed a finding that the plaintiff incurred some injury because of the accident, and that if the jury decided for the plaintiff on the question of liability, the jury must fix the amount of money that would reasonably and fairly compensate the plaintiff for the elements of damage proven by the evidence. Following deliberations, the jury returned a verdict in favor of the plaintiff, and awarded $72,000 for past and future medical expenses, but nothing for past and future pain and suffering, loss of a normal life, and lost wages. The jury also found that the plaintiff was 35% contributorily negligent and reduced the award to $46,800. Subsequently, the plaintiff filed a motion for a new trial on damages only, arguing that the jury's decision to award a significant sum for past and future medical expenses, but nothing for pain and suffering and loss of a normal life, was legally inconsistent. The trial court granted the plaintiff's motion and ordered a new trial on the issues of past and future medical expenses, past and future pain and suffering, and past and future loss of a normal life. The defendant then filed a petition for leave to appeal from the order granting a new trial on damages pursuant to Illinois Supreme Court Rule 306(a)(1) (eff. Nov. 1, 2017), which we granted.

¶ 27                                          II. ANALYSIS

¶ 28 On appeal, the defendant claims that the trial court erred in granting a new trial on the issues of past and future medical expenses, past and future pain and suffering, and past and future

15

loss of a normal life. The defendant argues that the jury's decision to award the plaintiff a portion of her initial medical bills and to award nothing for pain and suffering or loss of a normal life did not render the verdict internally inconsistent.

¶ 29    At the outset, we note that there is some disagreement about the proper standard of review. The standard of review is determined by the issue raised. Generally, a trial court's finding that the verdict was against the manifest weight of the evidence will not be reversed absent an abuse of discretion. *Snover v. McGraw*, 172 Ill. 2d 438, 449 (1996); *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455-56. It is important to remain mindful that in passing on the motion for new trial, the trial court had the benefit of previous observations regarding the demeanor of the witnesses and the circumstances aiding in the determination of credibility of those witnesses. *Maple*, 151 Ill. 2d at 456. If the trial court, in its discretion, finds that the verdict is against the manifest weight of the evidence, the court should grant a new trial. *Maple*, 151 Ill. 2d at 456. A verdict is against the manifest weight of the evidence where the findings of the jury are unreasonable, arbitrary, and not based upon any evidence. *Maple*, 151 Ill. 2d at 454.

¶ 30    In addition, we note the determination of damages is a question of fact, not law, and therefore, within the discretion of the jury. *Snover*, 172 Ill. 2d at 447. That said, justice requires that a verdict be set aside and a new trial ordered when a jury has ignored or disregarded a proven element of damages, the verdict resulted from passion or prejudice, or the award bore no reasonable relationship to the losses suffered. *Snover*, 172 Ill. 2d at 447.

¶ 31    This appeal involves a single claim in which the jury verdict was found to be legally inconsistent or inherently contradictory. Whether a verdict is legally inconsistent is a question of

16

law. *Redmond v. Socha*, 216 Ill. 2d 622, 642 (2005). Therefore, a trial court's order granting or denying a new trial based upon a claim of legally inconsistent verdicts presents a question of law subject to *de novo* review. *Redmond*, 216 Ill. 2d at 642. On review, this court will exercise all reasonable presumptions in favor of the verdict, and the verdict will not be found legally inconsistent unless it is absolutely irreconcilable. *Redmond*, 216 Ill. 2d at 643. A verdict will not be considered irreconcilable if it is supported by any reasonable hypothesis. *Redmond*, 216 Ill. 2d at 644.

¶ 32    In this case, the plaintiff's treating physicians, Dr. Bryant and Dr. Bhandarkar, opined within a reasonable degree of medical certainty that the plaintiff suffered an aggravation of preexisting conditions in her neck as a result of the motor vehicle accident. The preexisting conditions included degenerative changes in the cervical spine. Both treating physicians testified that there were objective findings that confirmed the plaintiff's complaints. The plaintiff was initially treated with physical therapy, anti-inflammatory medication, and pain medication. She was also instructed not to work and to limit activities that involved lifting. Dr. Bryant and Dr. Bhandarkar testified that the medical expenses listed in exhibit C were incurred to treat conditions caused by the accident. The defendant's expert, Dr. Taylor, agreed that the motor vehicle accident aggravated preexisting conditions in the plaintiff's neck and cervical spine. He also agreed that physical therapy and medication were appropriate treatments for the plaintiff's injuries. Dr. Bhandarkar and Dr. Taylor parted ways on the extent of the plaintiff's injury and the duration of the plaintiff's medical treatment for the neck injuries. Dr. Bhandarkar testified that the plaintiff's persistent neck complaints and his treatment were related to the auto accident. He testified that the plaintiff's condition had become chronic and would require future medical treatment, including pain management or surgery. Dr. Bhandarkar also opined that the carpal tunnel condition was more

likely than not related to the accident. Dr. Taylor disagreed. He testified that the plaintiff's symptoms related to the accident should have resolved within six to eight weeks after the accident. In addition, Dr. Taylor did not agree that the plaintiff's carpal tunnel syndrome was related to the accident.

¶ 33    In this case, the jury awarded a significant sum, $72,000, for the plaintiff's medical expenses. These included expenses for pain medication and physical therapy. However, the jury awarded zero damages for the elements of pain and suffering and loss of a normal life. Based upon the uncontroverted medical testimony, it logically follows that the plaintiff sustained injuries that produced pain and limited her ability to perform ordinary life activities for some period of time after the accident. After reviewing the evidence in the record, we conclude that the jury ignored proven elements of damage, and that the jury's verdict as to damages was irreconcilably inconsistent.

¶ 34                                III. CONCLUSION

¶ 35    In this case, the trial court did not err in granting the plaintiff's motion for a new trial on the issues of past and future medical expenses, past and future pain and suffering, and past and future loss of a normal life. Accordingly, the trial court's order is affirmed, and the cause is remanded for a new trial on those elements of damage.

¶ 36    Affirmed; cause remanded.